**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

Civil Action No._____

FRIENDS OF ANIMALS, a not-for-profit corporation;

Plaintiff,

v.

PAUL PHIFER, in his official capacity as Assistant Regional Director of Ecological Services for the Northeast Region Office of the United States Fish and Wildlife Service, and

DAN ASHE, in his official capacity as Director of the United States Fish and Wildlife Service,

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Recently, Defendant Dan Ashe, the Director of the U.S. Fish and Wildlife Service, told a small group of conservationists and others at a meeting held in Missoula, Montana, that he sees a "giant clash" between conservation and economic development, and that he believes that conservationists "must accept a world with fewer wolves, salmon, and spotted owls." The head of the federal agency most responsible for the protection of America's wildlife went on to say that, in the name of compromise, we must accept "a world with less biodiversity."[1] This case, challenging the issuance of an incidental take permit ("Permit") to Maine Department of Inland Fisheries and Wildlife ("Maine") for the take of Canada Lynx, is the direct result of just such a compromise.

---

[1] *See http://www.defendersblog.org/2014/07/must-accept/.*

2. On the one hand, the decision props up a controversial, declining industry that many Americans hope someday will become an economic relic—the North American fur industry.[2]

3. On the other hand, the decision sacrifices members of a species listed as threatened with extinction under the Federal Endangered Species Act ("ESA") and which is expected to decline by sixty-five percent in the next two decades. It does so by authorizing fur trappers and others to "incidentally" take up to 195 Canada lynx ("lynx") when trapping for other furbearing mammals throughout the state of Maine.

4. This compromise need not have been so one sided. In fact, the State of Maine, fur trappers, and hunters had previously agreed to a plan in 2007 that provides for far more restrictions on trapping in order to reduce the incidental take of Canada lynx.

5. As a result of FWS's issuance of the permit, it is certain that the state of Maine, fur trappers, and hunters will ask for the 2007 plan to be dissolved; indeed, FWS anticipates the permit will result in an overall increase in trapping activities in Maine.

6. In issuing the Permit, FWS violated its statutory obligations under the Endangered Species Act by failing to ensure the incidental take of Canada lynx would be minimized to the maximum extent practicable, as required by the Act. Accordingly, Friends of Animals, an international non-profit animal advocacy organization, comes now to this Court seeking declaratory and injunctive relief on the grounds that FWS's issuance of the Permit was arbitrary, capricious, an abuse of discretion and otherwise in violation of federal law.

---

[2] *See https://www.aei.org/publication/gallup-americans-more-tolerant-of-euthanasia-less-of-fur-coats/;*
*http://www.responsivemanagement.com/download/reports/NAMWC_Public_Opinion_Hunting.pdf; http://www.scientificamerican.com/article/impact-activism-on-fur/.*

**PARTIES**

7. Friends of Animals ("FoA") is a non-profit organization incorporated in the state of New York since 1957. FoA seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living and domestic animals. FoA engages in a variety of advocacy programs in support of these goals. FoA has nearly 200,000 members worldwide, including many that recreate and live in Maine. FoA brings this action on its own behalf and on behalf of its adversely affected members. FoA is harmed by FWS's decision to authorize the take of lynx pursuant to Maine's incidental take plan ("ITP"). Many FoA members enjoy recreating in areas affected by the Permit, and FWS's actions reduce the value of these areas for such use by these members by ruining the aesthetic beauty, sanctity, peacefulness and serenity of these areas. It also reduces the chance that FoA members will be able to view lynx while visiting these areas. FoA commented on FWS's draft environmental assessment asking the Service to consider the ethical and legal implications of issuing an incidental take permit and requesting that it issue an Environmental Impact Statement. FoA raised several concerns in its comment letter including that the Maine's Plan failed to minimize and mitigate the effects of taking lynx, and that FWS had not yet considered the impacts of issuing a permit.

8. Defendant Paul Phifer is the Assistant Regional Director of Ecological Services for the Northeast Region Office of the United States Fish and Wildlife Service, and is located in Hadley, Massachusetts. He authorized the Permit and signed the final decision at issue in this case.

9. Defendant Dan Ashe is the United States official responsible for ensuring that all FWS's actions comply with the requirements of the ESA.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). This action presents a case and controversy arising under the ESA and the Administrative Procedural Act ("APA"). This Court also has jurisdiction pursuant to 28 U.S.C. § 1346 as the United States is a defendant. The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment) and 28 U.S.C. § 2202 (injunctive relief).

11.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e), as a substantial part of the events giving rise to the claims occurred in this judicial district. FWS' Northwest Regional Office, located in Hadley, Massachusetts, was responsible for overseeing the review of the permit application submitted by the state of Maine. Defendant Paul Phifer is the Assistant Regional Director of Ecological Services for the Northeast Region Office and was the individual who signed and issued the Permit.

**LEGAL BACKGROUND: THE ENDANGERED SPECIES ACT**

12.     Congress enacted the ESA to conserve and recover endangered and threatened species and the ecosystems on which these species depend.  16 U.S.C. § 1531(b).

13.     The ESA reflects a national concern for the preservation and replenishment of a rapidly growing list of species that are threatened or endangered with extinction. "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978).

14.     The ESA and FWS's implementing regulations prohibit the "take" of any endangered or threatened species, such as Canada lynx. The ESA defines take broadly as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

15. The ESA also "affirmatively command[s] all federal agencies to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of an endangered species or result in the destruction or modification of habitat of such species." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173 (1978) (citing 16 U.S.C. § 1536).

16. Section 10 of the ESA provides a narrow exception to the ESA's take prohibition, and allows FWS to issue a permit authorizing limited takes that incidentally result from otherwise lawful activity. 16 U.S.C. § 1539(a)(1)(B).

17. The ESA requires applicants wishing to obtain an incidental take permit to submit a habitat conservation plan ("HCP") that specifies: (1) the impact which will likely result from the taking; (2) what steps the applicant will take to minimize and mitigate such impacts, and the available funding to implement such steps; (3) what alternative actions the applicant considered and the reasons why such alternatives are not being utilized; and (4) other measures that the Secretary may require as being necessary or appropriate for the HCP. 16 U.S.C. § 1539(a)(2)(A).

18. FWS must provide the public with an opportunity to comment on an applicant's HCP and application materials before determining whether to issue a permit. 16 U.S.C. §§ 1539(a)(2)(B) - (c).

19. Before issuing a permit, FWS must find, among other things, that: (1) the expected taking will be incidental; (2) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (3) the applicant has assured adequate funding for its HCP; and (4) the taking will not appreciably reduce the likelihood of the survival and recovery of listed species in the wild. 16 U.S.C. § 1539(a)(2)(B).

**FACTUAL BACKGROUND**

**A. Canada Lynx (*Lynx Canadensis)***

20. Canada lynx are medium-sized cats distinguished by their long legs, large furry paws, long tufts on the ears, and a short black-tipped tail. On average, male lynx



weigh about twenty-two pounds and female lynx weigh about nineteen pounds. [3]

21. The lynx's long legs and large feet make it highly adapted for hunting in deep snow. Thus, in snowy areas the lynx have a competitive advantage over potential competitors, such as bobcats or coyotes.

---

[3] Photograph of Canada Lynx by Keith Willams from Creative Commons, *available from* http://en.wikipedia.org/wiki/File:Lynx_Canadensis.jpg.

22. Lynx primarily prey on snowshare hare (*Lepus americanus).* Lynx also eat other small mammals and birds, especially when hare populations decline. However, reports show that lower hare densities correlate with low levels of lynx reproduction and population.

23. Lynx in the contiguous United States primarily reside in mixed coniferous and deciduous forests. A mix of forest stand age classes promote lynx survival, including late successional seral stages that support lynx denning, and early successional forest that support high quality snowshoe hare habitat.

24. In the contiguous United States, lynx historically occurred in most northern states and western mountainous areas as far south as Colorado. The range of the contiguous U.S. population has declined, and it only remains in fragmented habitats in four main regions: the Northeast, the Great Lakes, the Northern Rocky Mountains/Cascades, and the Southern Rocky Mountains. Each region is separated by unsuitable lynx habitat that creates an ecological barrier between the different lynx populations.

25. In the Northeast Region, a resident lynx population historically occurred in Maine, New Hampshire, Vermont, and New York. It is possible that lynx have been extirpated from New Hampshire, Vermont, and New York. Maine is the only Northeast state known to have a historical resident lynx population that persists today, making it a unique geographic area important to lynx in the contiguous United States.

26. There is not sufficient data to draw precise estimates of historical and current lynx populations in the United States or Maine. However, based on trends in forest management practices, lynx populations are projected to decline sixty-five percent by 2032. Human development, trapping, and climate change also pose serious threats to the lynx populations.

27. In Maine, lynx home range varies from around 6,145 to 15,040 acres, per lynx. Lynx expand their range when hare densities are lower. The home ranges in Maine may need to be considerably larger in the future to accommodate hare declines. This expansion makes lynx more vulnerable to human exploitation, including incidental take in traps or vehicle collisions.

28. In 2000, FWS listed the contiguous U.S. Distinct Population Segment of the Canada lynx as threatened with extinction under the ESA. FWS listed the lynx population as threatened because existing regulatory mechanisms do not adequately address the needs of the lynx, or reduce the threats to the species or its habitat.

29. One concern FWS expressed in the listing decision was about the loss of lynx through legal or illegal trapping and shooting.

30. In conjunction with the listing, FWS designated critical habitat for lynx in Maine, finding that it was important for Canada lynx conservation because it is the only area in the northeastern region of Canada lynx's range within the contiguous United States that currently supports a resident breeding Canada lynx population and likely provides connectivity with Canada for more peripheral portions of Canada lynx's range in the Northeast.

31. Lynx are also a species of special concern in Maine, and Maine's Wildlife Comprehensive Conservation Strategy identified incidental take (including trapping) as a threat to the lynx.

**B. Trapping.**

32. Trapping is the use of a device to remotely capture, and in some instances kill, animals. Trapping is indiscriminate with regards to which animals it harms and kills.

33. Two prominent trap types used in Maine are (1) leghold "non-lethal" traps and (2) conibear, or killer type traps. Under the Permit, a new type of trap will also be phased in: a cable restraint that is intended to capture the animal around its neck.

34. While trappers can use devices to "target" certain animals, there is no way to ensure that other animals will not be caught. Any type of body gripping trap, whether it be a leghold, conibear or cable restraint, can catch any animal that encounters it. Both endangered/threatened species and domestic pets have been injured and killed by these traps.

35. Leghold traps pose a serious risk of injury to both target and non-target animals. On land, leghold traps are most frequently set for bobcat, coyote, fox, raccoon, and other furbearing animals. Leghold traps are designed to catch the paw or leg of the animal and hold it until the trapper arrives to kill the animal. When an animal steps on a pan tension device on the trap, jaws slam shut on the animal's foot, leg, or toes. Injuries can result from the clamping force of the trap's jaws onto the animal's limb and/or from the animal's struggle to escape. Most animals react to the instant pain by frantically pulling against the trap in a desperate attempt to free themselves, some will even attempt to free themselves by chewing off their trapped leg. This desperate act of self-mutilation illustrates the pain and terror experienced by animals in these traps. Potential injuries include, but are not limited to, severe swelling, lacerations, joint dislocations, fractures, damage to teeth and gums, loss or disruption of blood circulation leading to gangrene, limb amputation, and death. Even if released, many perish later from internal injuries, reduced ability to hunt or forage for food, or inability to ward off predators. While some injuries are immediately visible, others are often not detected.

36. Conibear traps, also known as killer traps, are designed to snap shut in a scissor-like fashion on an animal's spinal column at the base of the skull, causing a fatal blow.

37. Five of the seven lynx reported as incidentally trapped in Conibear traps in Maine between 1999 and 2012 died.

38. Cable restraints are essentially wire nooses set to catch animals by the neck and can cause animals to slowly strangle to death. Studies indicate that lynx are extremely susceptible to strangulation and must be carefully handled around the neck, and that bobcats (and cats in general) can suffocate when wire loops are placed around their neck.

39. Being caught in a trap can traumatize and cause physical injuries and death to the captured animals. The majority of lynx that were examined by Maine after being caught in fur-bearing traps were either killed or exhibited some visible signs of injury.

40. Even apparently minor injuries assessed at the time of an animal's release may result in lameness which, directly through increased risk of predation or indirectly through reduced ability to hunt/find food in combination with possible stress of capture, can significantly reduce the likelihood of survival, with death potentially occurring weeks or months later. For example broken teeth from biting the trap may disrupt the lynx's ability to catch wild prey. Claw injuries also affect the lynx's ability to catch prey. In Maine's twelve year radiotelementry study, three out of eight lynx (38%) radio-collared after being caught in furbearing traps died within one month of being trapped.

C. Project History

41. In 2007, a group of conservationists filed suit against the state of Maine alleging that the state had authorized the take of Canada lynx by trappers in violation of the ESA.

42. In response to the 2007 lawsuit, the state of Maine agreed to a settlement that was memorialized in a Consent Decree and Order. The Consent Decree is attached to this Complaint as Exhibit A. The Consent Decree imposed various restrictions on trapping activities in areas of Maine considered to be lynx habitat. The Consent Decree contained a provision allowing the state of Maine to pursue a court order terminating the Consent Decree if the state was to obtain an ESA incidental take permit from FWS.

43. On August 13, 2008, Maine submitted an application for an ESA incidental take permit associated with the take of lynx as the result of trapping activities in the state. This application included a draft incidental take plan, which was intended to fulfill the ESA requirement for a habitat conservation plan. At the time it was submitted, the plan was intended to cover only the state's furbearing trapping program.

44. Maine submitted a revised incidental take plan on July 29, 2013. The revised incidental take plan expanded the trapping activities to also include Maine's animal damage control and predator management programs.

45. Maine submitted a final incidental take plan ("ITP") on or about October 28, 2014.

46. Maine's final ITP requested authorization to increase take of lynx by 20% in part due to take from new trapping techniques that were to be allowed in the state.

47. On November 4, 2014, FWS issued findings and recommended that the Permit be approved.

48. On November 4, 2014, FWS issued a finding that issuance of the permit was not a major federal action, and did not warrant preparation of an environmental impact statement.

49. On November 4, 2014, FWS approved the permit and corresponding ITP with no additional restrictions or conditions.

50.     The Permit authorizes the take of 195 Canada Lynx. Pursuant to the Permit, up to 183 Canada Lynx can be captured and released with no or minor injuries, nine Canada Lynx can be taken and released after severe injuries; and up to three lynx may be killed or non-releasable due to injuries.

51.     The Permit covers "all licensed trappers (non-resident, resident, alien, junior (resident and non-resident), and apprentice resident and non-resident trappers, complimentary over 70 trappers, lifetime trapping licenses including Native Americans that trap off tribal lands, ADC agents and PM trappers). Covered entities also include other people authorized to trap without trapping licenses such as Maine Department of lnland Fisheries and Wildlife (MDIFW) full -time employees (e.g., district game wardens, and wildlife biologists) and landowners trapping on their own land."

52.     FWS issued the Permit for a fifteen-year term, expiring in November 2029.

53.     The Permit makes several significant changes to the restrictions imposed on the state of Maine under the 2007 Consent Decree. A table created by FWS setting forth the Consent Decree restrictions and the changes to those restrictions under the Permit is attached to the Complaint as Exhibit B. This table shows that several restrictions on the use traps intended to protect lynx were eliminated by the Permit, and that the Permit overall eases the regulation of trapping in Maine.

54.     The Permit requires maintaining and enhancing 6,200 acres of lynx habitat as mitigation for the three lynx that are expected to be killed or unable to live in the wild due to permitted trapping.

55.     The best available science does not indicate that maintaining or enhancing 6,200 acres of high quality lynx habitat is sufficient to compensate for the killing of three lynx under the Permit.

56.     Maine has failed to demonstrate any binding commitment to improve lynx habitat. Maine's only step towards implementing the mitigation was to enter into a memorandum of understanding with Maine Bureau of Parks and Land to develop some mitigation plan in the future. Even if the mitigation was implemented according to plan to assist lynx habitat, the habitat created by the proposed mitigation activities will not be in a suitable condition to support lynx until 2052 to 2064.

57.     Before issuing the permit, FWS never received from the state of Maine sufficient information that the state could assure adequate funding for the ITP. Rather, Maine conceded in its ITP application? that it could not guarantee state funds for future activities to administer the requirements set forth in the ITP, which are not yet appropriated by the State legislature, and that it could not guarantee acceptance of grant monies unless it has received authorization from the Maine legislature to apply for and accept these monies.

58.     Less than two months after FWS issued the Permit, traps set in accordance with the Permit killed at least two lynx.

59.     The killings triggered a contingency provision in the Permit. Thus, on December 9, 2014, Maine adopted an emergency rule restricting the use of some of the trap types and sizes.

60.     Under the emergency rule, some killer type traps are still permitted in lynx wildlife management districts.

61.     Additionally, the emergency rule only remains in effect for ninety days.

62.     The Permit remains in place and has not been revoked.

13

## CLAIM FOR RELIEF

## (Violation of APA and ESA Section 10: Unlawful issuance of Incidental Take Permit)

63. Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

64. To issue an incidental take permit, FWS must find that "the applicant will, to the maximum extent practicable, minimize, and mitigate the impacts of the taking" 16 U.S.C. § 1539(a)(1)(B)(ii); 50 C.F.R. §§ 17.22(b)(2)(B) & 17.32(b)(2)(B). In considering this requirement, at least one court has stated the term "practicable" as used in the ESA means reasonably capable of being accomplished.

65. Here the Permit does not minimize and mitigate the take of lynx to the maximum extent possible. To the contrary, the Permit strips away numerous regulatory requirements currently in place under the 2007 Consent Decree that better minimize the chance of lynx take by trappers, requirements that are clearly "reasonably capable of being accomplished." Moreover, the permit contains ineffective and unenforceable mitigation for the anticipated take of lynx by trappers in Maine.

66. To issue an incidental take permit, FWS must also find that "the applicant will ensure that adequate funding for the plan will be provided." 16 U.S.C. § 1539(a)(1)(B)(iii).

67. Here, the state of Maine has not provided sufficient information for FWS to make a finding that it has assured adequate funding for its HCP as required by ESA.

68. Lastly, the FWS must find that "the permit will not appreciably reduce the likelihood of the survival and recovery of the listed species in the wild." 16 U.S.C. § 1539 (a)(2)(B)(iv). Here, the does not have sufficient information to find that the Permit

69. Defendants' findings and issuance of an incidental take permit to Maine are therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

FoA respectfully requests that this Court enter judgment providing the following relief:

A.     Declare that the Federal Defendants' issuance of the Incidental Take Permit to the state of Maine was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with federal law;

B.     Vacate the Incidental Take Permit;

C.     Enjoin any action previously authorized by the Incidental Take Permit at issue in this case unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

D.     Order FWS to carry out and/or require remedial relief for any harm to species already caused by the issuance and implementation of the Incidental Take Permit;

E.     Award Plaintiff reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and/or all other applicable authorities; and

F.     Grant such further relief as the Court deems just and equitable.


Respectfully submitted,

FRIENDS OF ANIMALS, Plaintiff,

By its attorney,

_____

Genevieve Byrne, Esq.
Counsel for Plaintiffs
BBO# 682315
301 Edgewater Place, Suite 100
Wakefield, MA 01880
(304) 261-1282

**gebyrne@gmail.com**                    15