## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **FRIENDS OF ANIMALS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PAUL PHIFER,** in his official | ) | |
| capacity as Assistant Regional | ) | |
| Director of Ecological Services for the | ) | |
| Northeast Region Office of the U.S. | ) | **1:15-cv-00157-JDL** |
| Fish and Wildlife Service, **et al.**, | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **STATE OF MAINE, et al.** | ) | |
| | ) | |
| **Intevenor Defendants.** | ) | |

## ORDER ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

This case concerns the Canada lynx, a wild cat that typically weighs about twenty pounds and has long legs; large, well-furred paws; long tufts on the ears; and a short, black-tipped tail. Canada lynx are most commonly found in Canada and several states contiguous to Canada, including Maine. The U.S. Fish and Wildlife Service (the "Fish and Wildlife Service" or "the Service") has listed Canada lynx as a threatened species under the Endangered Species Act, 16 U.S.C.A. §§ 1531-1544 (2016). 65 Fed. Reg. 16052-01 (Mar. 24, 2000), 2000 WL 299328 (F.R.).

The State of Maine prohibits the trapping of Canada lynx, but allows the regulated trapping of many other animals such as coyotes, bobcats, fishers, foxes,

martens, and other species.  Because traps catch animals indiscriminately, Canada lynx can be caught in traps set to catch other species.  When this happens, it is called a "take,"[1] which is permitted by the Endangered Species Act only if an incidental take permit has been issued.  16 U.S.C.A. § 1539(a)(1)(B).  In November 2014, the Service issued an Incidental Take Permit (the "Permit") to the Maine Department of Inland Fisheries and Wildlife ("Maine") which exempts the State from liability for incidental takes of Canada lynx resulting from its state-regulated trapping programs.  AR-0070422.[2]  In response, two sets of plaintiffs filed separate actions asserting that the Permit violates both the Endangered Species Act and the National Environmental Policy Act, 42 U.S.C.A. § 4321, *et seq.* (2016).  All claims are brought under the Administrative Procedure Act, 5 U.S.C.A. § 706 (2016).

The first action was filed against the Service and its then-director, Daniel M. Ashe, by three environmental advocacy organizations: the Center for Biological Diversity, the Wildlife Alliance of Maine, and the Animal Welfare Institute.  The second action was filed by a fourth organization, Friends of Animals, against Director Ashe and against Paul Phifer, in his capacity as the Assistant Regional Director of Ecological Services for the Northeast Region Office of the Fish and Wildlife Service.  The two cases were ordered consolidated in October 2015.  The State of Maine, U.S. Sportsmen's Alliance Foundation, Maine Trappers Association, and National Trappers Association have intervened as defendants.  This matter is before the court

---

[1] The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19).

[2] All references to the documents in the administrative record begin with the letters "AR" and are followed by the document's page number in the record.

on the cross-motions for summary judgment filed by the Plaintiffs and the Service. For the reasons explained below, the Plaintiffs' Motion for Summary Judgment is denied and the Service's Cross-Motion for Summary Judgment is granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    The 2006 Litigation and the 2007 Consent Decree

In 2006, the Animal Protection Institute, a national, nonprofit animal advocacy organization based in California, sued Maine, alleging that it was violating Section 9 of the Endangered Species Act, 16 U.S.C. § 1538, by authorizing and allowing trapping that killed protected species such as bald eagles, Canada lynx, and gray wolves. *Animal Protection Institute v. Martin,* Case No. 1:06-cv-00128-JAW, ECF No. 1 at 1-2, ¶ 1.  In 2007, Judge John A. Woodcock, Jr., entered a Consent Decree and Order in the *Martin* case which required Maine to adopt numerous measures to minimize the incidental take of Canada lynx in Maine's recreational trapping program.[3]   1:06-cv-00128-JAW, ECF No. 134 at 2-6.   The Consent Decree also permitted Maine to seek an order from the court terminating the decree if the Fish and Wildlife Service issued an incidental take permit pursuant to the Endangered Species Act that authorized the State's trapping program.

### B.    Maine's Application for an Incidental Take Permit

Maine filed its first application for an incidental take permit with the Fish and Wildlife Service in June 2007, AR-0007618-0007843, and over the next seven years it

---

[3]  The measures that Maine adopted included issuing new regulations in 2007 and 2008 which limited the size of foothold traps in lynx habitat in an effort to reduce the number of incidental takes of Canada lynx, and required trappers to report any incidental lynx takings so that Maine state biologists could examine the captured lynx and rehabilitate them before releasing them to the forests. *Animal Welfare Inst. v. Martin,* 623 F.3d 19, 22-23 (1st Cir. 2010).

submitted multiple revised drafts of its Incidental Take Plan in response to the Service's comments. AR-0008787-0008807; AR-0009869-0010146; AR-0011188-0011508; AR-0013350-51; AR-0070457-0070458. Maine submitted the final version of its Incidental Take Plan in October 2014, in which it proposed that up to 195 lynx[4] could be incidentally trapped over a fifteen-year period, of which up to three could involve lethal take, and up to nine lynx could experience a major injury. AR-0070103.

In October 2014, the Service issued an Environmental Assessment as required by the National Environmental Policy Act, which addressed the environmental impact of Maine's proposed Incidental Take Permit. AR-0069861-0070041. The Environmental Assessment concluded that the proposed Incidental Take Permit would not be a major federal action that would significantly affect the quality of the human environment and, therefore, a more comprehensive Environmental Impact Statement was not required for the Permit. AR-0069954-56; *see also* AR-0070462-64. Also in October, the Service issued its Biological Opinion, a requirement of Section 7 of the Endangered Species Act.[5] AR-0070042-0070093. The Biological Opinion concluded that the proposed Incidental Take Permit was not likely to jeopardize the continued existence of Canada lynx or result in an adverse modification of any designated critical habitat. AR-007043. The Service approved and issued Maine's Incidental Take Permit in November 2014. AR-0070422-23.

The Plaintiffs seek a declaratory judgment determining that: (1) the Service violated the Endangered Species Act by arbitrarily and capriciously approving the

---

[4] All references to "lynx" in this opinion are to Canada lynx.

[5] See note 10, *infra*.

Permit; and (2) that the Service violated the National Environmental Policy Act by failing to prepare an Environmental Impact Statement for the Permit.  The Plaintiffs also seek an injunction vacating the Permit, as well as reasonable costs, litigation expenses and attorneys' fees.   As part of its response, the Service has challenged the standing of one of the four Plaintiffs, Friends of Animals, to sue.

## II. STANDARD OF REVIEW

When reviewing a final agency decision for alleged violations of the Endangered Species Act or the National Environmental Policy Act, courts conduct their review under § 706(2)(A) of the Administrative Procedure Act.  *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011).  Under the Administrative Procedure Act, the court must determine whether the agency's decision was made "without observance of procedure required by law," 5 U.S.C.A. § 706(2)(D), and whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (the "arbitrary and capricious" standard), *id.* at § 706(2)(A).

"An agency acts arbitrarily or capriciously if it has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 574 (D.C. Cir. 2016) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008)).  Stated differently, "[t]he task of a court reviewing agency action under the [Administrative Procedure Act's] arbitrary and

capricious standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Penobscot Air Servs., Ltd. v. FAA,* 164 F.3d 713, 719 (1st Cir. 1999) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quotation marks omitted)).

Regarding the National Environmental Policy Act, an Environmental Impact Statement is required if there is a "substantial possibility" that the agency action could significantly affect the human environment. *Sierra Club v. Marsh,* 769 F.2d 868, 870-76 (1st Cir. 1985). Judicial review must ensure that "the agency has taken a 'hard look' at the environmental consequences" of the proposed action and the decision not to prepare an Environmental Impact Statement. *United States v. Coalition for Buzzards Bay,* 644 F.3d 26, 31 (1st Cir. 2011).

### III. LEGAL ANALYSIS

I first address (A) the Fish and Wildlife Service's challenge to Friends of Animals' standing to sue, and then consider the Plaintiffs' challenges to the Permit under (B) the Endangered Species Act and, (C) the National Environmental Policy Act.

**A.     Standing to Sue**

The Fish and Wildlife Service argues that Friends of Animals lacks standing to sue because the declarations submitted by members of the organization do not establish that the members suffered an injury in fact, which is one of the requirements for standing.

6

The "irreducible constitutional minimum of standing contains three elements: (1) that the plaintiff suffered an injury in fact, (2) that there is a causal connection between the injury and the conduct complained of, and (3) that it is likely that the injury will be redressed by the requested relief." *Sutliffe v. Epping Sch. Dist.,* 584 F.3d 314, 325 (1st Cir. 2009) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992) (internal quotation marks omitted)).   The injury in fact requirement for standing arises from Article III of the U.S. Constitution, and requires that the alleged injury be both "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robbins,* 136 S.Ct. 1540, 1548 (2016) (internal quotations omitted).

To demonstrate an injury in fact, Friends of Animals submitted declarations prepared by two of its members, Katherine Grazyk and Peter Weissbrod.   The declarations indicate that as of the filing of the complaint, Grazyk and Weissbrod had never visited Canada lynx habitat, but that they had decided in December 2014 that they would plan a trip to view lynx or signs of lynx.   They ultimately arranged an October 2016 trip to Moosehead Lake, which is at the southern edge of lynx habitat. Grazyk and Weissbrod asserted that their ability to view lynx or signs of lynx would be harmed if the Permit remained in place.

In arguing that the declarations do not establish standing, the Service does not challenge the causation or redressability elements of standing, but only whether Grazyk and Weissbrod suffered a cognizable injury in fact.   The Service asserts that: (1) Grazyk's and Weissbrod's trip to Moosehead Lake was scheduled to take place before the trapping season and, therefore, the Permit would have no adverse effect

on their ability to view Canada lynx; and (2) the declarations are silent as to when Grazyk and Weissbrod made their plans to visit Moosehead Lake and, therefore, do not demonstrate that they had definite plans at the time Friends of Animals filed its complaint.  Neither argument is persuasive.

First, although Grazyk's and Weissbrod's visit to Moosehead Lake was scheduled to take place before the 2016 trapping season, Maine's Permit was in effect during the 2015 trapping season.  Thus, any incidental take from the previous trapping season could have affected Grazyk's and Weissbrod's ability to view lynx in October 2016.  In addition, the Service acknowledges that Moosehead Lake is located in one of Maine's Wildlife Management Districts in which lynx are found.  Because it is reasonably possible that the Permit has or will, over time, diminish Grazyk's and Weissbrod's ability to observe Canada lynx in their natural habitat, the declarations establish a concrete injury that is actual or imminent.  *See Animal Welfare Inst. v. Martin,* 623 F.3d 19, 25-26 (1st Cir. 2010) (Plaintiffs adequately alleged an injury in fact by asserting that "Maine's trapping regulations, by causing Canada lynx to be taken, interfere with the Canada lynx's natural state and may increase the animals' risk of death, reducing the likelihood that the members will observe Canada lynx in their natural state on future visits.").

Second, Grazyk's supplemental declaration establishes that she joined Friends of Animals in December 2014 having learned of possible threats to Canada lynx in Maine, and she decided at that time to visit Moosehead Lake to view Canada lynx. Grazyk's plan to visit Moosehead Lake, formulated prior to the filing of the complaint, was sufficiently definite to make the alleged threat of future harm to her and

Weissbrod's ability to view Canada lynx in their natural habitat particularized as to them.[6]  *See Spokeo,* 136 S.Ct. at 1548 (quoting *Lujan,* 504 U.S. at 560 n.1) ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'").

Accordingly, Friends of Animals has standing to sue.

## B.    The Endangered Species Act

Section 9 of the Endangered Species Act, 16 U.S.C.A. § 1538(a)(1)(B), makes it unlawful to take a member of an endangered species.  By regulation, it is also unlawful to take a member of a threatened species, that is, a species likely to become endangered in the foreseeable future.  *Animal Welfare Inst.,* 623 F.3d at 21 (citing 50 C.F.R. § 17.31(a)).  As noted earlier, the Canada lynx is a threatened species.

Section 10 of the Endangered Species Act, 16 U.S.C.A. § 1539, creates an exception to the general ban on taking endangered and threatened species.  Under Section 10, the Service may issue a permit allowing "any taking otherwise prohibited by [the Endangered Species Act] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  16 U.S.C. § 1539(a)(1)(B).  Before issuing the permit, the Fish and Wildlife Service must find that the taking will be incidental; that the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; that adequate funding for a habitat conservation

---

[6]  In addition, "[i]t is settled principle that when one of several co-parties (all of whom make similar arguments) has standing, an appellate court need not verify the independent standing of all the others."  *Houlton Citizens' Coal. v. Town of Houlton,* 175 F.3d 178, 183 (1st Cir. 1999); *see also Montalvo-Huertas v. Rivera-Cruz,* 885 F.2d 971, 976 (1st Cir. 1989) ("[w]here coplaintiffs have a shared stake in the litigation—close identity of interests and a joint objective—the finding that one has standing to sue renders it superfluous to adjudicate the other plaintiffs' standing.").

plan will be provided; and that the taking "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* at § 1539(a)(2)(B)(i)-(iv).

The Plaintiffs claim that the Service's decision to grant Maine's Incidental Take Permit was arbitrary and capricious in four respects: (1) the calculation of the cumulative amount of incidental take of Canada lynx that would be allowed during the Permit period; (2) the minimization of incidental take; (3) the mitigation of the impacts of incidental take; and (4) the adequacy of Maine's funding for its habitat conservation program.  I address each issue in turn.

### 1.    The Incidental Take Calculation

In its Permit application, Maine requested approval for a cumulative incidental take of up to 195 lynx over a fifteen-year period.  AR-0070103; AR-0070433.  Maine calculated this number by reviewing data on incidental lynx take from the years 1999 to 2012 and selecting the year with the greatest amount of take as the basis for its calculation.  AR-0070164-65; AR-0070433.  That year was 2004, during which eleven trapped lynx were reported.  AR-0069927-28; AR-0070433; AR-0070164.  Maine then added a twenty percent "allowance" of two additional lynx per year in order to adjust for uncertainties such as unreported lynx takes, larger traps, and the changing susceptibility of lynx to traps,  *id.*, bringing the estimated annual take to an average of thirteen lynx per year, or 195 lynx over the fifteen-year life of the Permit.  Out of the cumulative total of 195 lynx, the application provided that up to three would be permitted to be killed or rendered non-releasable, up to nine would be permitted to be captured and released after treatment for severe injuries, and up to 183 would be

permitted to be captured and released with no injuries or only minor injuries.  AR-0070167-68; AR-0070462.

The Plaintiffs argue that the Fish and Wildlife Service arbitrarily accepted Maine's take calculation despite the existence of certain alleged flaws in the data. They argue that the Service (a) failed to include data regarding incidental takes from 2013 and 2014 in the take calculation; (b) omitted illegally-set traps, unreported takes, and non-lethal takes from the take calculation; (c) failed to account for Maine's Animal Damage Control and Predator Management Programs; and (d) used inconsistent estimates of the baseline lynx population.

### (a)  Data from 2013 and 2014

The Plaintiffs argue that the Fish and Wildlife Service acted arbitrarily by failing to consider take data from 2013 and 2014 in the data it relied on in approving the Permit.  ECF No. 112 at 28 (citing AR-0058247).  They claim that this is important because fourteen and twenty lynx were captured and released in 2013 and 2014, respectively, making each year's incidental take higher than 2004, the year with the highest take in Maine's data set, which was used to arrive at a cumulative take of 195 lynx over the fifteen-year life of the Permit.  *Id.*  The Plaintiffs calculate that if the 2014 take data were applied, then the total number of lynx taken under the Permit would rise eighty-five percent, from 195 lynx to 360 lynx.  *Id.*

### (i) The 2013 Data

Maine submitted its revised Incidental Take Plan to the Fish and Wildlife Service in March 2013, AR-0046896, and submitted a second revised Plan in July 2013, AR-0059419.  At that point in time, it was reasonable for the Service to consider

Maine's incidental take estimate based upon a data set that ended in 2012. Even the Plaintiffs acknowledge that at the time this methodology was accepted, the available data pertained to the years 1999 to 2012.

Contrary to the Plaintiffs' argument, the Service accounted for the 2013 take data the following year in its October 2014 Environmental Assessment which noted that fourteen lynx had been incidentally trapped in 2013. AR-0069916 n.19. The Service concluded that the annual estimate of eleven trapped lynx was still accurate as a long-term average and observed that Maine had included the twenty percent allowance in its calculation to account for fluctuations in the anticipated annual take during the course of the Permit period, *id.*; AR-0069927-28, resulting in an estimated annual average take of thirteen lynx.

The total of fourteen lynx trapped in 2013 was one more than the take calculation's estimated average of thirteen per year, and constitutes just the sort of fluctuation that the Service accounted for in the Environmental Assessment. *Id.* Moreover, as the Service asserts, the take authorization of 195 lynx is an upper limit under which a higher take may not occur, thus resulting in a more conservative take authorization that results in greater protection for the species. *See Friends of the Wild Swan v. Jewell,* 2014 WL 4182702, at * 6 (D. Mont. Aug. 21, 2014) (concluding that the Service "did not act arbitrarily or capriciously in choosing an analytical tool that resulted in greater protection."). Thus, the Service's failure to adjust the take calculation in response to the 2013 data was neither arbitrary nor capricious.

### (ii) The 2014 Data

On November 3, 2014, one day before the Fish and Wildlife Service issued the Permit, *see* AR-0070462-64, Maine notified the Service that the number of lynx trapped thus far that year had increased from three to thirteen.  AR-0069857-58.  The Service argues that it was reasonable for it to issue the Permit under those circumstances because thirteen captured lynx was consistent with the take calculation's projected annual average, and because there was no certainty that the number would increase during the remainder of the season.

The Service issued the Permit almost immediately after learning that an entire year's worth of projected incidental take had already occurred during the early coyote and fox season, and just as the general 2014 trapping season was beginning.[7]  Although the Service's contention that there was no certainty that more lynx would be captured during the remainder of the trapping season is undoubtedly correct, it is a weak ledge on which to rest given that the general trapping season was barely one day old and the take calculation was premised on an estimated average of thirteen takes per season.  Nevertheless, two aspects of the administrative record demonstrate that it was not arbitrary or capricious for the Service to approve the Permit despite receiving this information one day before the Permit was issued.

---

[7] The general trapping season began on November 2, 2014.  *See* Maine Department of Inland Fisheries & Wildlife, *Maine Hunting & Trapping: 2014-2015 State of Maine Summary of Hunting & Trapping Laws and Rules*, pp. 36, 40 (2014).

First, the Service had addressed the effects of a hypothetical "worst case scenario" on Maine's Canada lynx population in its October 2014 Biological Opinion.[8] The Service concluded that "even if lethal take from trapping in Maine was a magnitude higher than anticipated by [Maine], it is almost certain to be below the threshold for population effects." AR-0070071. The Biological Opinion reasoned that if, in the span of one year, all three lynx permitted to be killed were killed, and all nine lynx that were permitted to be severely injured were severely injured and consequently failed to reproduce for the rest of their lifetimes, plus various additional uncertainties combined to cause an additional fifteen lynx deaths, the resulting 5.4 percent decrease in the lynx population was "far below the rates that occur in sustainable harvest programs." AR-0070070. In fact, the Biological Opinion concluded that "annual trapping mortality would have to exceed 50 to 100 Canada lynx, or 10 to 20 percent [out of an estimated baseline population of 500] respectively, before Canada lynx populations would be impacted." AR-0070071. In contrast with

---

[8] Section 7 of the Endangered Species Act requires all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence" of any endangered or threatened species or result in the destruction of critical habitat. 16 U.S.C. § 1536(a)(2). The term "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies[,]" including the granting of permits. 50 C.F.R. § 402.02 (2016). To comply with this provision, the Endangered Species Act requires that a federal agency consult with the Service under certain circumstances. *Id.* at § 402.14(a). The Service must then craft a Biological Opinion that determines whether the action, taken together with its cumulative effects, "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* at § 402.14(g)(4).

In most cases, another agency's actions are at issue and the question is whether that agency has a duty to consult with the Service. Here, because the "action agency" is the Service itself, the question is whether the Service's action in issuing the Incidental Take Permit would affect the Canada lynx. If so, it must complete an "internal consultation" process to satisfy Section 7. 16 U.S.C.A. § 1536(a)(2); *Env. Prot. Info. Ctr. v. Simpson Timber Co.,* 255 F.3d 1073, 1077 & n.5 (9th Cir. 2001). This internal consultation process resulted in the Biological Opinion.

this finding, the thirteen captured lynx that the Service learned of the day before approving the Permit were all "released at the capture site with no or minor injury." AR-0069857.[9]

Second, Maine assumed in its Incidental Take Plan that there would be annual fluctuations in the amount of lynx trapped.  *See* AR-0070217-19.  The estimate of thirteen lynx per year was an average; thus, the prospect that the 2014 trapping season would exceed the average was not, without more, a reason to reject the Service's earlier analysis.  Moreover, the Plan had accounted for the possibility that the number of incidental takes might exceed the projected average of thirteen per year by including a "changed circumstance" provision.  *Id*.  This provides for the implementation of additional minimization measures if the average number of incidentally-captured lynx exceeds thirteen per year over a rolling five-year period. *Id*.

The worst case scenario employed by the Service as part of its Biological Opinion analysis assumed facts far worse than those presented by the 2014 data received the day before the Permit was approved.  Because the Service factored the worst case scenario into its decision to approve the Permit, and with the Incidental Take Plan having provided for the implementation of additional minimization measures if the number of incidentally-captured lynx exceeds projections, the

---

[9]  The Plaintiffs also assert that the 2014 data, indicating a total of twenty takes, was available to the Service when it issued the Permit.  This assertion is inaccurate because at the time the Service approved the Permit, the available information was that thirteen lynx had been taken.  AR-0069857. A total of twenty lynx were ultimately captured by the end of the 2014 season.  AR-0073817.

Service's decision not to reconsider the take calculation based on the 2014 year-to-date data was neither arbitrary nor capricious.

### (iii) Conclusion

"The task of a court reviewing agency action under the [Administrative Procedure Act's] arbitrary and capricious standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Penobscot Air Servs.,* 164 F.3d at 719 (internal quotation marks omitted). Here, the record demonstrates that the Fish and Wildlife Service had a rational basis to proceed with issuing the Permit even after learning that a higher number of lynx had been captured in 2013 and 2014 compared to previous years, and despite the fact that the take calculation utilized a data set spanning the years 1999 to 2012. The Incidental Take Plan anticipated the possibility of a greater take and mandated additional minimization efforts if the number of lynx takes exceeded thirteen per year over a rolling five-year period. The record reflects that the Service considered the pertinent evidence, as well as several alternative approaches to analyzing the take calculation, *see* AR-0069928; AR-0069965; AR-0070434, and its explanation for adhering to an average annual take of thirteen lynx was rationally connected to the facts and the Permit's approval.

### (b) Unreported Takes, Non-Lethal Takes, and Illegally Set Traps

The Plaintiffs contend that the Fish and Wildlife Service's decision to issue the Permit was arbitrary and capricious because Maine's take calculation omitted data

from unreported takes, non-lethal takes, and illegally set traps.  For the reasons that follow, I find these arguments unpersuasive.

Turning first to unreported takes and non-lethal takes, the Plaintiffs rely upon notes made in October 2014 by one or more Service staff members that were critical of a revised draft of the Environmental Assessment.  AR-0066009.  They also rely upon staff notes expressing concern that the methods used to develop the take calculation were "confounded by assumptions" and "uncertainty."  AR-0058249.

Although it is noteworthy that one or more Service staff members were critical of how unreported and non-lethal takes were accounted for in the take calculation, such criticism does not, by itself, render the Service's acceptance of the take calculation arbitrary and capricious.  *Turtle Island Restoration Network v. U.S. Dep't of Commerce,* 2013 WL 4511314, at *5 (D. Haw. Aug. 23, 2013) ("The court sees no reason to attribute to any agency every comment made by agency employees during preliminary and internal discussions preceding the agency's articulation of its position."); *see also Nat'l Wildlife Fed'n v. Norton*, 306 F. Supp. 2d 920, 928 n.15 (E.D. Cal. 2004) (citation omitted).  This conclusion is bolstered by the fact that the Service identified portions of the administrative record which indicate that it gave due consideration to unreported takes and non-lethal takes before approving the Permit.  For example, in a 2013 memorandum prepared as part of a revision to its Permit application, Maine indicated that there was little to no evidence supporting the claim that many incidental takes of lynx went unreported.  AR-0049221 ("[s]ome members of the public commented that many incidentally trapped lynx are not being reported . . . [but Maine] has observed good compliance with mandatory reporting of incidental

lynx captures."). The memorandum also states that prior to the introduction of a 2008 rule making it mandatory to report an incidental lynx capture, eighty-one percent of the lynx caught in traps were reported to Maine by trappers, *id.,* and that after the mandatory reporting requirement went into effect, twenty-three out of twenty-four lynx that were captured since 2009 were reported, *id.* Additionally, in its Environmental Assessment, the Service determined that "[Maine] has addressed the potential for non-reporting in several ways[,]" including increased compliance checks by Maine game wardens and existing federal and state penalties. AR-0069966.

With regard to the Service's decision not to include illegally-set traps in the take calculation, this court previously determined in *Martin* that "the state's licensure and regulation of trapping must be the 'stimulus' for the trappers' conduct that results in incidental takings . . . [and] the trappers' conduct must not be an independent intervening cause that breaks the chain of causation between the state and the incidental takings of lynx." *Martin*, 588 F. Supp. 2d at 113 (quotation omitted). Thus, unlawful take resulting from actions that violate the rules or statutes associated with Maine's trapping program is not "incidental" to that program. AR-00704427. Consistent with this view, the Incidental Take Plan provided that trappers who set illegal traps "would be subject to prosecution for violations of [s]tate and [f]ederal law." AR-0070150 ("[I]f . . . a violation of rule or law is found to have caused or contributed to the capture or subsequent injury or fatality, then . . . the capture will not count toward [Maine's] authorized take under the [P]lan."). The Service scrutinized Maine's commitment to "investigate every lynx capture event, in

cooperation with the Service law enforcement staff," and to prosecute illegal activities "to the full extent of the State and Federal law." AR-0070442. It found the process established by Maine to be "practicable and reasonable." *Id.*

For the foregoing reasons, it is apparent that the Service weighed the relevant factors and had a rational basis to exclude illegally-set traps from the take calculation. Its decision to do so was not arbitrary and capricious.

### (c) Maine's Animal Damage Control or Predator Management Trapping Programs

The Plaintiffs fault the Fish and Wildlife Service for not increasing the take calculation to account for Maine's Animal Damage Control and Predator Management trapping programs which, they claim, added significantly more trapping and increased potential take. ECF No. 112 at 18 (citing AR-0046859; AR-0046872). They also note that according to the Incidental Take Plan, forty percent of incidental takes in 2012 were from trappers enrolled in the Predator Management Program. *Id.* at 29 (citing AR-0070164). The Plaintiffs argue that the take calculation should have been increased to account for this fact. *Id.*

With respect to the Animal Damage Control Program, the Plaintiffs' argument is undercut by the Service's Environmental Assessment. The Service found that the Animal Damage Control Program is aimed primarily at trapping beaver and that no lynx have ever been reported caught by Animal Damage Control trappers. AR-0069876; AR-0070149. Regarding the Predator Management Program, the Plaintiffs' argument is contrary both to the draft Incidental Take Plan that they cite as well as the final Incidental Take Plan. AR-0046859; AR-0070380. Both Plans indicate that

the Predator Management Program "is not expected to significantly increase statewide trapping effort but rather redirect existing efforts to . . . specific Designated Areas." *Id.*

Additionally, the number of incidental takes attributable to the Predator Management Program does not demonstrate that the Service arbitrarily accepted an improperly low take calculation. The Incidental Take Plan reflects that Maine took the number of captures from the Animal Damage Control and Predator Management Programs into account. The Service found that "[f]or the purposes of the projected take calculations for this Plan, the maximum capture rate was used for both programs[.]" AR-0070165.

Based on the record, the Service did not arbitrarily or capriciously accept a take calculation that failed to account for Maine's Predator Management and Animal Damage Control Programs.

### (d) Estimates of the Baseline Lynx Population

The Plaintiffs allege that the Fish and Wildlife Service relied upon inconsistent, shifting, and contradictory baseline lynx population estimates in the final Environmental Assessment, in the Biological Opinion, and in a Service memorandum regarding the Service's findings and recommendations (the "Findings Document") that accompanied its Finding of No Significant Impact. The Plaintiffs also allege that the Service itself acknowledged this inaccuracy but used the population estimates anyway.

The Plaintiffs base their argument on a September 2014 email between three Service biologists, in which one biologist, AH, stated that she intended to change the

population estimate in a new draft of the Biological Opinion from "approximately 750 individuals" to "more than 500," and she noted that the latter population estimate "reiterat[ed]" the estimate used in the draft Environmental Assessment.  AR-0063451.  Another biologist, LW, responded to AH that "you are correct that the population number we use in our explanation of the baseline in the [Environmental Assessment, Biological Opinion], and Findings should be the same." AR-0063450.  A third biologist, MM, expressed skepticism about the population estimate of 500 lynx, but stated that he was "comfortable" using it so long as the new draft of the Biological Opinion contained a caveat that AH had previously written, to the effect that the estimate of 500 lynx "may well be lower than the actual population." *Id.*  AH then replied to MM that "[n]ow that I read my prose again, I might flip the emphasis . . . i.e., [']recognizing that the actual population may well be *higher*[.]'" *Id.* (emphasis added).

The preceding email exchange suggests, as the Plaintiffs argue, that the Service's staff was aware that the baseline lynx population was not consistent between the Environmental Assessment and the Biological Opinion.  The exchange also demonstrates that the inconsistency was considered and reconciled to the satisfaction of the three biologists involved. *See* AR-0063450-51.  In keeping with this resolution, the Findings Document also employed the "more than 500" baseline.  AR-0070424.

The Plaintiffs also contend that there is an inconsistency between the Biological Opinion and the final Environmental Assessment, each of which relied upon a minimum baseline population estimate of 500 lynx, and the Incidental Take

Plan, which stated that 750 to 1,000 adult lynx lived in northern Maine in 2006. ECF No. 112 at 29 (citing AR-0069861, AR-0070042, AR-0070057). The 750 to 1,000 population figure for 2006 mentioned in the Incidental Take Plan was the product of a 2012 study that was cited in both the Biological Opinion and the Environmental Assessment as reflecting the estimated lynx population at "about the time when [Maine] believed that lynx populations peaked" in 2006. AR-0069898; *see also* AR-0070057; AR-0074349 (citing "Vashon et al. 2012"). Moreover, as explained in the Biological Opinion, there were "shortcomings" in Maine's methods of estimating the lynx population, and for that reason, the Service relied on the lower estimate of 500 lynx:

> Both methods have shortcomings, but indicate that northern Maine supports a population of more than 500 adult Canada lynx. For the purposes of this biological opinion, we will rely on a minimum population estimate of 500 adult Canada lynx in Maine, although the actual population may well be higher.

AR-0070057. By using a lower lynx population figure, the Service adopted an analytical tool that resulted in greater protection for the lynx, which was a reasonable exercise of the agency's discretion. *San Luis & Delta-Mendota Water Authority v. Jewell,* 747 F.3d 581, 610 (9th Cir. 2014) (The Service "did not act arbitrarily or capriciously in choosing an analytical tool that resulted in greater protections for the [endangered or threatened species].").

The Plaintiffs also claim that the 2015 amended Incidental Take Plan listed the lynx population as being 750 to 1,000 but then stated that Maine used estimates of 750 and 600 for its population modeling. ECF No. 112 at 29-30 (citing AR-0074349). As just discussed, the page from the amended Incidental Take Plan cited

by the Plaintiffs contains the same estimate of between 750 and 1,000 adult lynx in Maine in 2006 as stated in the original Incidental Take Plan, but it does not mention "750 or 600" lynx as the Plaintiffs assert. AR-0074349. Also, there is no difference between the population estimates contained in the 2014 Incidental Take Plan, *see* AR-0070115, and the corresponding section of the 2015 amended Incidental Take Plan, *see* AR-0074349.

Finally, the Plaintiffs claim that the Service admitted that it did not use the most recent population data, and yet it proceeded to approve the Permit despite knowing that the less recent data resulted in an inaccurate and inflated lynx population estimate. Again, the Plaintiffs' argument is not supported by the record evidence that they cite, in this instance a footnote from the Biological Opinion.[10] *See* AR-0070069 n.8.

### (e) Conclusion

The Service's acceptance of Maine's take calculation was the product of a logical and rational process for which the Service has "articulated a satisfactory explanation . . . including a rational connection between the facts found and the choice

---

[10] The Biological Opinion contains a brief discussion of a 2007 analysis of lynx population growth rates based on demographic data collected in Maine beginning in 1999 and using a computer program called "VORTEX." AR-0070069. In a footnote to that discussion, the Service states that the VORTEX analysis was completed in 2007, at the beginning of a decline in the snowshoe hare population that lasted until approximately 2011. AR-0070069 n.8. The upshot of this footnote was to make clear that the data used in the VORTEX analysis "would inflate [Maine's] projections of [the lynx] population *growth rate*[,]" AR-0070069 n.8 (emphasis added), not the estimated lynx population as the Plaintiffs contend. Moreover, as discussed above, the Incidental Take Plan cited a different population study completed in 2012 ("Vashon, et al. 2012") that estimated the lynx population in Maine to be approximately 750 to 1,000 lynx as of 2006 and which explicitly stated that this figure reflected a time when Maine believed that the lynx population peaked. AR-0070115. The Service then acknowledged the limitations of Maine's methods for estimating the lynx population and used the lower estimate of 500 lynx, while recognizing that the actual population may well be higher. AR-0069898; AR-0070057.

made." *Penobscot Air Servs.,* 164 F.3d at 719 (citation and quotation omitted).  The Service's acceptance of Maine's take calculation was neither arbitrary nor capricious.

### 2.    Minimization Measures

As part of the permit review process, the Fish and Wildlife Service must determine that the applicant will, to the maximum extent practicable, minimize the impacts of the authorized incidental taking.   16 U.S.C.A. § 1539(a)(2)(B)(ii).   The Plaintiffs argue that the Service arbitrarily failed to insist on additional minimization measures, including several contained in the 2007 Consent Decree in the *Martin* case and others that the Plaintiffs claim the Service demanded throughout the permit drafting process, but, without explanation, did not require when the Permit was issued.  Although the Plaintiffs assert that both the alleged failure to require more minimization measures and the lack of explanation were arbitrary and illegal, the administrative record establishes otherwise.

### (a)    Minimization Measures Included in the 2007 Consent Decree

The 2007 Consent Decree prohibited two types of traps from certain state Wildlife Management Districts that contained lynx habitat: (1) snares, i.e., traps which catch animals by the neck or leg and can be lethal, and (2) so-called "foothold" traps with an inside jaw spread width greater than five and three-eighths inches.[11] AR-0006068-69 (Consent Decree, *Animal Protection Inst. v. Martin, et al.,* 1:06-cv-

---

[11]  The 2007 Consent Decree did not prohibit such foothold traps if they were set fully under water. AR-0006068.

00128-JAW).   The Plaintiffs argue that the Fish and Wildlife Service arbitrarily omitted prohibitions on both types of traps from the Permit without reason.

With regard to snares, the Service responds and the record reflects that Maine's Incidental Take Plan does not allow the use of snares on dry land, and the Permit does not authorize take associated with the use of snares.  AR-0070104; AR-0069960; AR-0070441 ("Nonlethal cable restraints are not snares, and [Maine] will not be changing the existing prohibitions on the use of snares in Maine under this plan.").  With regard to foothold traps, the Service maintains that available data did not support continued restrictions on foothold traps larger than five and three-eighths inches, citing a Maine study that showed that "[t]he number of lynx captures per year did not decrease after trap size restrictions were put in place in 2008[,]" AR-0049217; *see also* AR-0069891 (Environmental Assessment stating "capture and injury rates did not differ for lynx when larger foothold traps were permitted (i.e., prior to 2008)").  The Maine study provided direct support for the Service's conclusion regarding foothold traps.

Moreover, the Service acknowledged in the Findings Document that although it had previously raised concerns that larger and heavier foothold traps with a larger jaw spread could increase injury rates in captured lynx, Maine had provided data that showed that the injury rate for incidentally captured lynx prior to the consent decree, when trap sizes were not limited, was similar to or lower than the injury rate for lynx caught by Maine biologists using smaller traps.  AR-0070440 (citing AR-0070236).  The Service also observed in the Findings Document that Maine had incorporated a changed circumstances provision in the Incidental Take Plan that

25

could result in new restrictions on foothold trap sizes if higher injury rates were found to occur.  *Id.*

### (b)    Minimization Measures Previously "Demanded" By the Fish and Wildlife Service

The Plaintiffs contend that for six years, the Fish and Wildlife Service repeatedly insisted on four minimization measures during the multi-year process of reviewing the Permit application, yet abruptly dropped its demands without explanation when it approved the Permit in 2014—an outcome that the Plaintiffs claim was arbitrary and capricious.  The four minimization measures in question are: (1) requiring lynx exclusion devices in all killer-type traps set in upland areas in Wildlife Management Districts containing lynx; (2) requiring that Best Management Practice ("BMP") foothold traps[12] be phased in over a five-year period in lynx Wildlife Management Districts; (3) eliminating drag sets[13] for foothold traps in lynx Wildlife

---

[12] A "BMP trap" is a trap that conforms to "best management practices," as determined by the Association of Fish & Wildlife Agencies, a professional organization that represents U.S. and Canadian state and provincial wildlife agencies.  *See* AR-0070440; *see also* Association of Fish and Wildlife Services, www.fishwildlife.org (last visited Jan. 13, 2017).  The Association of Fish and Wildlife Services defines its best management practices as "carefully researched educational guides designed to address animal welfare and increase trappers' efficiency and selectivity."  Association of Fish & Wildlife Agencies, *Best Management Practices for Trapping Canada Lynx in the United States,* http://www.fishwildlife.org/files/Lynx_BMP_F.pdf (2006).  "Trapping BMPs identify both techniques and traps that address the welfare of trapped animals and allow for the efficient, selective, safe[,] and practical capture of furbearers."  Association of Fish & Wildlife Agencies, *Best Management Practices for Trapping in the United States,* http://www.fishwildlife.org/files/Introduction_BMPs.pdf (2006).

[13] Neither party defines the term "drag set," nor is a concise definition to be found on the Internet. Based on the record, I understand a drag set to be a foothold trap that is not staked into the ground, but instead has an anchor attached to it via a metal chain that allows the captured animal to move a short distance.

Management Districts; and (4) eliminating blind sets[14] in lynx Wildlife Management Districts.

The Plaintiffs cite two undated and unsigned spreadsheets in the record titled "Minimization and mitigation measures that USFWS believes would meet the maximum extent practicable issuance criteria" which address three of the four minimization measures listed above.[15]  *See* ECF No. 112 at 31 (citing AR-0039643, AR-0040471).   Both documents speak of minimization measures that the Service "believes" would meet issuance criteria, AR-0039643, and both contain recommendations rather than demands.  AR-0039647-56; AR-0040475-84.   Neither spreadsheet supports the Plaintiffs' claim that the Service "repeatedly insisted on" any of the cited minimization measures.  *See id.*

The Plaintiffs also cite certain file notes written by one or more dissenting Service staff members.   AR-0062087, AR-0053924, AR-0053315, AR-0036039, AR-0036112, AR-0036131.   One of these documents states that the notes constitute the author's "<u>personal</u> assessment of the practicability of minimization measures[.]"  AR-0062088 (emphasis in original).  As previously noted, "the mere existence of internal disagreements does not make the agency's decision arbitrary or capricious."  *Turtle Island Restoration Network,* 2013 WL 4511314, at *5 ("The court sees no reason to attribute to any agency every comment made by agency employees during

---

[14]  A "blind set" is "any set designed to catch a wild animal, without the use of bait, lure, or visible attractor, by intercepting the animal as it moves naturally through its habitat." *Animal Welfare Inst. v. Martin,* 668 F. Supp. 2d 254, 260 n.6 (D. Me. 2009).

[15]  Neither of the two spreadsheets mention blind sets.  *See* AR-0039647-56; AR-0040475-84.

preliminary and internal discussions preceding the agency's articulation of its position."); *see also Nat'l Wildlife Fed'n*, 306 F. Supp. 2d at 928 n.15 (citation omitted).

There is positive support in the administrative record for the Service's decision not to require the four minimization measures at issue.  Turning first to the lynx exclusion devices, in its Environmental Assessment, the Service found that the use of leaning pole traps was as effective at minimizing incidental lynx captures.  AR-0069962 ("[Maine] disputes that exclusion boxes . . . are a practicable alternative to leaning pole sets . . . .  Since there should ultimately be no difference in outcomes for lynx, the Service agrees that [Maine's] approach will serve as an effective and biologically sufficient avoidance measure.").  The Service based this decision on data provided by Maine which showed that no lynx had been caught or killed in legally set leaning pole devices since the Consent Decree was put in place.  AR-0070176.

With regard to BMP traps, the Incidental Take Plan considered the use of such traps but determined that because BMP traps are developed for specific target species other than lynx, there was insufficient data regarding the benefit of BMP traps to lynx.  *See* AR-0070440[16]; *see also* AR-0070236 ("The purported benefits of reducing lynx take or injuries by requiring all trappers to use only traps meeting Best Management Practices . . . standards is not supported by National BMP data or BMP data collect[ed] in Maine.").

---

[16]  In their reply brief, the Plaintiffs claim that the Service, in the 2014 Findings Document, stated that BMP traps probably would benefit non-target-species such as lynx.  The cited page in the Service's 2014 Findings Document states that "[w]hile it is reasonable to assume that BMP traps may also have benefit to nontarget species, *data have not been collected . . . to evaluate this*."  AR-0070440 (emphasis added).

Similarly, with regard to drag sets, the Service based its decision not to eliminate their use on data provided by Maine which "indicates that they did not observe a difference in the number or severity of injuries for lynx caught in foothold traps that were chained to stakes or that were chained to drags from 1999 to 2012." AR-0069962.

Finally, with regard to blind sets, the Environmental Assessment recognized that Maine "presents information that no lynx have been reported to be captured in blind sets." AR-0070009. The Service also noted that Maine's Incidental Take Plan included a changed circumstance provision to address higher than anticipated lynx injuries or deaths resulting from blind sets. *Id.*

### (c)    Conclusion

As previously noted, under the Administrative Procedure Act an agency must articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Grosso v. Surface Transp. Bd.,* 804 F.3d 110, 116 (1st Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (quotation marks omitted)). Here, the Fish and Wildlife Service has identified information contained in the administrative record that provides the rational connection needed to support its decision not to require the specific minimization measures identified by the Plaintiffs.

### 3.    Mitigation Measures

In considering whether to grant an incidental take permit, the Fish and Wildlife Service must also determine that the applicant will, to the maximum extent practicable, mitigate the impacts of such incidental taking. 16 U.S.C.A. §

1539(a)(2)(B)(ii).   Maine's Incidental Take Permit requires the Maine Bureau of Public Lands to develop a forestry management plan.   The plan calls for the creation or restoration of 6,200 acres of high quality hare habitat and is intended to result in a net increase of three lynx to compensate for the three lynx that, under the Permit, are permitted to be killed or so severely injured that they are not able to be released over the fifteen-year life of the Permit.   AR-0070423.

The Plaintiffs challenge two aspects of the approved mitigation measures: (a) mitigation of non-lethal takes, and (b) creation of lynx habitat.

### (a)  Mitigation of Non-Lethal Takes

The Plaintiffs argue that the mitigation measures contained in Maine's Incidental Take Plan are flawed because they only address the three lynx deaths authorized by the Permit, but not the 192 non-lethal takes.   In response, the Fish and Wildlife Service notes that § 1539 of the Endangered Species Act requires mitigation for the *impact* of incidental takes, rather than mitigation for each individual take, and asserts that the 192 permitted non-lethal takes are not anticipated to have a discernable impact.   ECF No. 113 at 54 (citing AR-0070442-43).   The Plaintiffs counter by asserting that the Service arbitrarily discounted the impact of non-lethal takes upon Canada lynx.

First, the Plaintiffs contend that the Service's position is contradicted by its own conclusion in the Findings Document, which states that up to nine lynx could sustain "more severe" injuries.   AR-0070434.   Consequently, they argue, it was arbitrary for the Service to discount these injuries as having no impact.   The Plaintiffs presume that these injuries must have an impact because they are described with the

phrase "more severe[.]"  The Findings Document reasoned, however, that those lynx that sustain "more severe" injuries "will be treated and/or rehabilitated to the point that they can be released back in to the wild to function naturally in their environment."  AR-0070443.  This supports the Service's conclusion that the injuries will not have a discernable impact.

Second, the Plaintiffs cite data presented in the Findings Document stating that six percent of lynx caught in foothold traps between 1999 and 2012 had moderate to severe injuries, and seventy-five percent had mild injuries.  AR-0070434.  The Findings Document also recognized that "[n]one of these data are necessarily more appropriate or more reliable than the data presented in the [Incidental Take Plan] due to differences in injury assessment protocols."  *Id*.  Moreover, as explained above, the cited data does not account for the fact that, according to the Findings Document, lynx sustaining "more severe" injuries will, as required by the Plan, be treated and/or rehabilitated to the point that they can be released back in to the wild to function naturally in their environment.  AR-0070443.

Third, the Plaintiffs cite the Findings Document to argue that lynx caught in foothold traps do not live as long or function as well as lynx not caught in such traps.  ECF No. 120 at 13 (citing AR-0070440; AR-0070424; AR-0070433-34).  The Findings Document at AR-0070440 does refer to "more than minor" injuries, but only in reference to Maine's method for identifying injuries to lynx that may affect the ability of the lynx to survive post-release.  *See* AR-0070440 ("[S]uch assessments should be sufficient in most cases to evaluate the type of injuries (e.g., more than minor) that will affect the ability of lynx to function naturally in their environment and may affect

their ability to survive post release."). The reference to "more than minor" injuries does not support the Plaintiffs' assertion that trapped lynx have shorter life spans or function poorly compared to non-trapped lynx. *See id.* The assertion that lynx caught in foothold traps do not live as long or function as well as lynx not caught in such traps is also not supported by AR-0070424 and AR-0070433-34, which the Plaintiffs cite for support.

The Plaintiffs also claim that the Service's own biologists and lynx experts sought mitigation for the entire take of 195 lynx, citing three documents from the administrative record.

The first document is titled "Further notes to file concerning mitigation." AR-0060735. Because the document indicates that the "goal of mitigation" is "to offset the take of 3 lynx[,]" it actually supports the Service's position.

The second document is an excerpt of an undated, unsigned spreadsheet titled "Minimization and mitigation measures that USFWS believes would meet the maximum extent practicable issuance criteria[.]" AR-0039658. The spreadsheet appears to have been prepared in 2012,[17] and discusses details of the mitigation plan that were never adopted, such as a 10,000 acre lynx habitat on land owned by the Maine Bureau of Parks and Land. *See* AR-0039658. Thus, the document does not appear to have been prepared in conjunction with the final Incidental Take Plan or the approved Permit. It contains a recommendation that "habitat mitigation be the primary means of mitigation in the final [Incidental Take Plan]. Final acreage . . .

---

[17] Although the document is undated, the documents that appear immediately before and immediately after it in the administrative record both date to 2012.

will need to mitigate for all forms of take." *Id.* The spreadsheet casts this recommendation as an item to "consider including in the final [Incidental Take Plan]." AR-0039643.

The third document is dated February 2012 and is titled "Strategies to achieve mitigation for lynx incidentally taken in traps." AR-0038285. It contains a recommendation that Maine "employ mitigation that clearly offsets (or better yet, more than offsets) take of lynx in traps (lethal take, animals removed from the population, injuries that would reduce survival)[.]" *Id.*

The administrative record does not establish the context in which the second and third documents were prepared and utilized. Neither document appears to be a formal, final document that expresses the final or official view of the Service. Consequently, they are not dispositive of whether the Service arbitrarily or capriciously discounted the effects of non-lethal takes. *Cruz v. Brock,* 778 F.2d 62, 64 (1st Cir. 1985) (agency did not act arbitrarily or capriciously in disregarding "preliminary, less official data."); *see also, Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 384 F.3d 1163, 1174 (9th Cir. 2004) (rejecting argument that documents demonstrated that an agency's conclusions were arbitrary and capricious because the email was a "compilation of ideas" under discussion, "preliminary, and not the official view of the agency.").[18]

---

[18] The Plaintiffs also contend that in earlier drafts of the Environmental Assessment, the Service stated that the Permit must mitigate for both lethal and non-lethal takes of lynx, but arbitrarily abandoned this position without explanation. ECF No. 112 at 33 (citing AR-0022833, AR-0053924). The record citations do not support the Plaintiffs' contention. The first document cited, AR-0022833, states that "[t]rapping of lynx constitutes take even if the animal is not killed or injured[,]" but makes

In evaluating the impact of the proposed Plan, the Service considered Maine's estimate of the take as well as information from lynx population model projections "and the observed results of directed Canada lynx and bobcat harvest programs[.]" AR-70079. That information indicated that the incidental capture and release of uninjured lynx does not change the survival rates of lynx; thus, the Service concluded, "the impact of the take that ultimately needs to be addressed is the potential for injuries that are more than minor and fatalities that may result from incidental capture events." AR-70438. The Service concluded that over the Permit's fifteen-year life, "the effect of anticipated mortalities and injuries on the Canada lynx population is likely to range from completely compensatory during periods of high hare populations to small and short-lived during periods of low hare populations and declining Canada lynx numbers." *Id.*; *see also* AR-70072; 69938-39 (observing that the three lynx fatalities authorized by the Permit "are a small proportion of the lynx population in Maine and will not have an effect [on] the overall population in the state[.]").

Based on the portions of the administrative record cited by the Plaintiffs, considered together with other relevant portions that reflect the Service's reasoning, it is apparent that the Service did not, as the Plaintiffs contend, fail to consider relevant factors and evidence, or fail to articulate a reasonable explanation for its decision to limit the mitigation measures to the three lethal takes out of the 195 takes

no mention of mitigation. The second cited document, AR-0053924, discusses *legal* versus *illegal* take and what constitutes illegal take, and does not discuss mitigation. *See id.*

authorized by the Plan. The remaining 192 takes require the release of the animal into the wild (183 involving no or minor injuries and nine involving severe injuries for which the animal will be treated before being released). There is a rational connection between the facts as found by the Service and its decision to focus the mitigation measures on the three authorized lethal takes. *See Penobscot Air Servs. Ltd.*, 164 F.3d at 719.

### (b) Creation of Lynx Habitat

"The primary factor driving Canada lynx behavior, habitat use, abundance, and distribution is the abundance of snowshoe hare, their primary prey." AR-0070055. Snowshoe hare prefer habitat that provides the sort of dense cover found in regenerating spruce and fir stands approximately 15 to 35 years after a forest is clear cut. *Id.* Yet the quality of the currently-existing hare habitat is expected to peak in approximately 2023 because clear-cutting of forests sharply declined in the late 1980s, and as forests mature they become less hospitable to snowshoe hares. AR-0070213; AR-0070056. The Incidental Take Plan proposed to offset the potential lethal take of up to three lynx by having the Maine Bureau of Public Lands create 6,200 acres of high quality habitat for snowshoe hare within a 22,046 acre habitat management area by the end of the fifteen-year Permit period. AR-0070210; AR-0070443. To create the habitat, the Bureau of Public Lands will selectively harvest larger, mature trees to enable the growth of new trees. AR-0070213. The Plan includes required monitoring of forest management activities, surveys to estimate the hare population, as well as a changed circumstance provision if the mitigation proves unsuccessful. AR-0070124; AR-0070217; AR-0070223-24. The creation of this

additional snowshoe hare habitat is expected to result in at least three additional lynx in the area by 2029, and possibly as many as five.  AR-0070210.

The Plaintiffs argue that this aspect of the mitigation plan is arbitrary because it relies on logging and other forest management to create optimal lynx habitat and because it could take twelve years or more for the proposed 6,200 acres to develop into a quality habitat for snowshoe hares.  Thus, the Plaintiffs contend that the mitigation area will have limited value for hares and lynx during the fifteen-year life of the Permit.  Moreover, the Plaintiffs argue that Maine has no incentive to continue maintaining the habitat after the term of the Permit has expired, and therefore, the Permit provides no assurance of a quality habitat.

The claim that the mitigation plan will have limited value during the Permit's lifespan overlooks evidence in the administrative record reflecting that the habitat management area already contains approximately 4,398 acres of high quality hare habitat that can support at least two adult lynx.  AR-0070212 (reflecting 3,798 acres of existing high quality hare habitat as of 2013); AR-0074096 (reflecting the discovery in 2015 of a further 600 acres of currently-existing high quality hare habitat). According to the Incidental Take Plan, the quality and suitability of these acres as hare habitat would degrade over time if left unmanaged as the trees mature.  AR-0070211.  Thus, the management of the high quality hare habitat should benefit the hare population and, by extension, the lynx population, during the permit's term.  The Service also cited data based on a twelve-year telemetry study showing that lynx have higher litter sizes when hares are more abundant.  AR-0070212.  "This increase in fecundity could increase the value of the mitigation beyond just compensating for the

loss of three lynx." AR-0070445. The administrative record thus provides support for the Service's conclusion that the creation and active management of the habitat during the life of the Permit is rationally connected to the Plan's objective of supporting additional lynx during the Permit period.

As for the Plaintiffs' argument that Maine has no incentive to maintain the habitat after the Permit expires, the habitat created during the Permit period will not simply disappear once the Incidental Take Permit expires. Rather, the regenerating trees are expected to provide high quality hare habitat for approximately thirty-five years and the habitat created by the mitigation plan "may be present on the mitigation area until 2052 to 2064[.]" AR-0069893. Furthermore, Maine addressed the possible need to amend its mitigation efforts by including a changed circumstance provision in the Incidental Take Plan which, if triggered, would require either an increase in the size of the mitigation area or an extended mitigation period. AR-0070225.

The administrative record supports the Incidental Take Plan's creation, over time, of additional hare habitat sufficient to support three additional Canada lynx as a means of mitigating the impacts of the taking on Maine's population of Canada lynx as a whole. The Plaintiffs have not demonstrated that the Service acted arbitrarily or capriciously in approving this aspect of the Incidental Take Plan. *See City of Olmsted Falls, OH v. FAA,* 292 F.3d 261, 271 (D.C. Cir. 2002).

### 4.   Funding

Section 10 of the Endangered Species Act requires that an applicant for an incidental take permit ensure that adequate funding for the conservation plan will

be provided.  16 U.S.C.A. § 1539(a)(2)(B)(iii).  The Incidental Take Plan states that Maine will fund it with revenues from the sale of hunting and fishing licenses, federal matching funds, general funds appointed by the Maine Legislature, federal threatened and endangered species funds, the sale of state conservation license plates, the Fish and Wildlife Service's State Wildlife Grant program, and "grants from a variety of private and governmental organizations."  AR-0070227.

The Plaintiffs characterize Maine's identification of fees, grants, and other funds as a "laundry list of speculative, third-party funding sources" and object that the State has not ensured adequate funding because reliance on anything other than guaranteed funding is arbitrary.  ECF No. 112 at 35-36 (citing *Sw. Ctr. for Biological Diversity*, 470 F. Supp. 2d at 1155-56; *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1282 (S.D. Ala. 1998)).  The Service responds that the Plaintiffs mischaracterize the source of funding for the conservation plan, and that the Maine Department of Inland Fisheries and Wildlife has committed to include in its biennial budget request the funds needed for the conservation plan and to use those funds to carry out the plan's measures.  ECF No. 113 at 60 (citing AR-0070227).

The Incidental Take Plan requires adequate funding as a precondition to authorizing the incidental take of lynx.  The Plan states that Maine "will provide evidence that the Legislature has appropriated sufficient funding to implement this plan by July 15th each year" and also states that "[i]ncidental take authorization under the [P]ermit is contingent on demonstrating adequate annual funding for plan implementation, including both [the Department of Inland Fisheries and Wildlife] and [the Maine Bureau of Public Land]."  AR-0070227.  This provision also puts to

38

rest the Plaintiffs' added objection that the Service removed the threat of mandatory permit revocation that was contained in prior drafts of the Incidental Take Plan by replacing the word "shall" with "may."  ECF No. 112 at 36 (quoting prior drafts of the Plan as stating that failure to demonstrate sufficient funding by July 15th of each year "shall" be grounds for revocation of the Permit.).

Because the Incidental Take Plan requires Maine to produce proof of adequate funding to support the Plan each year, and identifies several credible funding sources, the Service had a sound basis to conclude that the adequate funding requirement was met.

## C.   The National Environmental Policy Act ("NEPA")

The Plaintiffs also contend that the Fish and Wildlife Service violated NEPA and the Administrative Procedure Act by failing to prepare an Environmental Impact Statement for the Permit.  After producing its final Environmental Assessment (AR-0069861-AR-0070041), the Service issued a Finding of No Significant Impact in November 2014.  AR-0070462-64.  Under NEPA, this Finding relieved the Service from having to prepare an Environmental Impact Statement.  *Padgett v. Surface Transp. Bd.,* 804 F.3d 103, 109 (1st Cir. 2015) (quoting *Sierra Club v. Wagner,* 555 F.3d 21, 24 (1st Cir. 2009)).  The Plaintiffs argue that this decision was arbitrary because the Incidental Take Permit implicates six of the ten intensity factors listed in the relevant Council on Environmental Quality regulations.

### 1.   NEPA Statutory Framework

NEPA "requires federal agencies . . . to consider and report on the environmental effect of their proposed actions."  *WildEarth Guardians v. Jewell*, 738

F.3d 298, 302 (D.C. Cir. 2013). "The goal of NEPA is to focus attention on the possible environmental effects of proposed actions, which in turn furthers two important purposes: to ensure that agencies do not make decisions based on incomplete information, and to provide information about environmental effects to the public and other governmental agencies in a timely fashion so that they have an opportunity to respond." *Town of Winthrop v. FAA,* 535 F.3d 1, 4 (1st Cir. 2008) (citing *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 371 (1989)). An agency meets these aims through the preparation of an Environmental Impact Statement for any agency action that will "significantly affect[ ] the quality of the human environment." *Union Neighbors United, Inc.,* 831 F.3d at 568-69 (quoting 42 U.S.C. § 4332(C)) (internal quotation marks omitted) (alteration in original).

Regulations issued by the Council on Environmental Quality, 40 C.F.R. §§ 1501.1, *et seq.,* implement NEPA's requirements. These regulations allow agencies to comply with NEPA by first preparing an Environmental Assessment to determine whether a contemplated action is likely to have a significant impact, in which case an Environmental Impact Statement is required. *O'Reilly v. U.S. Army Corps of Eng'rs,* 477 F.3d 225, 228 (5th Cir. 2007). If the contemplated action is likely to have no significant impact, a Finding of No Significant Impact is required. *Id.*

In determining whether a proposed action will likely have a significant impact, the Council on Environmental Quality regulations require an agency to consider context and intensity. 40 C.F.R. § 1508.27. Context refers to a wide range of considerations, from "society as a whole" to the "affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity refers to "the severity of the

impact." *Id.* at § 1508.27(b).  The Council on Environmental Quality regulations list ten "intensity factors" an agency must consider when evaluating the intensity of an impact in order to determine whether it is "significant."  *Id.* at § 1508. 27(b)(1)-(10).

The Plaintiffs contend that the presence of a single intensity factor usually compels the preparation of an Environmental Impact Statement, yet § 1508.27 does not mandate the preparation of an Environmental Impact Statement based on the presence of a single intensity factor.  *See id.*  "While some courts have held that the presence of one or more of these intensity factors *may be* sufficient to require an Environmental Impact Statement, [it is inaccurate to] assert that the presence of a single one of the factors warrants an [Environmental Impact Statement]." *Advocates for Transp. Alt., Inc. v. U.S. Army Corps of Eng'rs,* 453 F. Supp. 2d 289, 300-301 (D. Mass. 2006) (citation and internal quotation marks omitted).  The ten intensity factors provide a framework for an agency to evaluate the severity of the impacts of a proposed action on the human environment.  *See* 40 C.F.R. § 1508.27(b). Thus, the weight to be given any single factor turns on the facts and circumstances associated with the proposed action.

### 2.   Intensity Factors

The Plaintiffs contend that the Fish and Wildlife Service's decision not to prepare an Environmental Impact Statement was arbitrary and capricious because the Permit implicated the following six intensity factors: (a) the impact of the Permit on a species listed under the Endangered Species Act; (b) the impact of the Permit on an ecologically critical area; (c) the potential precedential effect of the Permit; (d) the significant cumulative effects of the Permit on the environment; (e) the uncertain

effects of the Permit; and (f) the highly controversial effects of the Permit.  ECF No. 112 at 37-38 (citing 40 C.F.R. § 1508.27).

### (a) Adverse Impact of the Permit on an Endangered or Threatened Species or its Habitat

The Council on Environmental Quality regulations require an agency to consider "the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."  40 C.F.R. § 1508.27(b)(9).

The Plaintiffs argue that the Fish and Wildlife Service violated NEPA by not preparing an Environmental Impact Statement because in the context of the other threats to the species, the Permit may have a significant adverse impact on the Canada lynx.  The Plaintiffs quote the Service's March 2000 Final Rule listing the lynx as threatened, which included the statement that "[i]f other threats to a resident population of lynx exist, the additive nature of additional losses to the population may prove significant, at least on a local scale."  AR-0002044 (internal quotation marks omitted).  They maintain that this observation cannot be squared with the Service's conclusion in its 2014 Environmental Assessment that the incremental effects of trapping on lynx over the fifteen-year life of the Permit will be negligible. AR-0069954-55.

The Plaintiffs' argument rests on a selective reading of the excerpt from the cited 2000 Final Rule.  In fact, the Service concluded at that time that it had no information that the loss of lynx from trapping mortality "has negatively affected the

overall ability of the United States [distinct population segment of Canada lynx] to

persist":

> If the population is doing well in an area and there are no threats to its
> continued existence, trapping mortality would not likely jeopardize the
> population.  However, if other threats to a resident population exist, the
> additive nature of additional losses to the population may prove to be
> significant, at least on a local scale.  Mortality from accidental trapping
> or animal damage control activities would be considered incidental and
> in most cases would not be significant; we have no information to
> indicate that the loss of such individuals has negatively affected the
> overall ability of the contiguous United States [distinct population
> segment of Canada lynx] to persist.

AR-0002044 (65 Fed. Reg. 16064 (Mar. 24, 2000)).

Elsewhere, the Plaintiffs claim that the Service failed to consider the "adverse

impact" intensity factor because the Permit fails to adequately minimize and mitigate

the impacts of trapping on the lynx population, and because there are no assurances

in the Permit that the mitigation and minimization measures will be effective.  This

argument is unpersuasive because it merely repeats the Plaintiffs' critique of Maine's

minimization and mitigation measures, which are addressed in sections III.B.2. and

3., above.

### (b)  Impact of the Permit on an Ecologically Critical Area

The Council on Environmental Quality regulations require an agency to

consider the "[u]nique characteristics of the geographic area such as . . . ecologically

critical areas."  40 C.F.R. § 1508.27(b)(3).  The Plaintiffs argue that an Environmental

Impact Statement is required because the Permit will allow trapping throughout lynx

habitat and in the proposed mitigation area, which they contend are ecologically

critical.  There is no dispute that a total area of 10,123 square miles in northern Maine has been designated as critical lynx habitat.  AR-0070080.

The Plaintiffs' assertion that it was arbitrary for the Service to conclude that the Permit will not cause a significant impact is based upon nothing more than a citation to the Incidental Take Plan's general description of the Plan area.  ECF No. 112 at 39 (citing AR-0070106 (describing the defined lynx range in Maine)).  The description provides no substantive support for the Plaintiffs' position.  Moreover, the Service devoted several pages of its Biological Opinion to a "Determination Of Effects On Critical Habitat Designated For The Canada Lynx."  AR-0070080-85.  The Service found that "trapping activities as proposed in the [Incidental Take Plan] will have insignificant effects" on such constituent elements of the habitat [such] as snowshoe hare population and snow conditions and thus would not adversely affect critical lynx habitat in Maine.  AR-0070081-82.  Thus, the record establishes that the Service considered the ecologically-critical nature of the area, *see* AR-0069978, as required by 40 C.F.R. § 1508.27(b)(3).

### (c)  Potential Precedential Effect of the Permit

The Council on Environmental Quality regulations require an agency to consider "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration."  40 C.F.R. § 1508.27(b)(6).  The Plaintiffs assert that because Maine's Permit is the first permit issued for incidental lynx take by a state's recreational trapping program under the Endangered Species Act, the Fish and Wildlife Service

should have considered the precedential nature of the Permit in its Environmental Assessment.

The Service included a detailed discussion of the precedential effect of the Permit in the Environmental Assessment. ECF No. 119 at 27. The Service explicitly concluded that it did "not agree that issuing an incidental take permit for trapping is precedential[.]" AR-0069981. The Service observed that the measures required by the Permit were largely required under the 2007 Consent Decree and are neither new nor novel. *Id.* Furthermore, although the Permit might serve as an example for other states, the Permit is specific to Maine's laws and regulations. Thus, permits sought by other states will have to address those states' laws and regulations, as well as the specific trapping techniques and species at issue. *Id.* The administrative record demonstrates that the Service considered the precedential effect of the Permit and presented a reasoned basis for its conclusion.

### (d) Significant Cumulative Effects of the Permit on the Environment

The Council on Environmental Quality regulations also require an agency to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). The Plaintiffs maintain that an Environmental Impact Statement is required because the Fish and Wildlife Service itself concluded in the Environmental Assessment that there would be significant cumulative effects, including from climate change, changing forest practices, and residential and energy development that would have

significant impacts on the lynx.  ECF No. 112 at 40-41 (citing AR-0069634).  This is not, however, a fair characterization of the Environmental Assessment.

> The Environmental Assessment states in pertinent part that:
>
> Although the long-term cumulative effects from changing land ownership patterns, changing forest practices, residential and energy development and climate change may substantially influence the human environment in Maine, the incremental effects of trapping over the 15-year life [of the Permit] under any of the alternatives analyzed in this [final Environmental Assessment] (including the proposed action) will be negligible.  Furthermore, most of the effects of alternatives evaluated in this [final Environmental Assessment], including population-level effects on wildlife, would be reversed over just a few years if a different approach is adopted at the end of the 15-year permit period.

AR-0069634.  Thus, the Environmental Assessment did not conclude that the Permit was related to other actions which, in combination, would result in significant cumulative effects on the quality of the human environment or, more specifically, on the lynx population.  The record reflects that the Service gave due consideration to cumulative effects, *see* AR-0069634 ("Cumulative effects and the alternatives considered"), and the Plaintiffs have identified no basis for concluding that the Service's analysis fell short of the requirements of § 1508.27(b)(7).

### (e)  Uncertain Effects of the Permit

The Council on Environmental Quality regulations also direct an agency to consider "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks."  40 C.F.R. § 1508.27(b)(5).  Because there is a certain "quotient of uncertainty" that is always present when making predictions about the natural world, agency decisions are generally upheld despite such uncertainty.  *Ctr. for Biological Diversity v. Kempthorne,* 588 F.3d 701,

712 (9th Cir. 2009).   Accordingly, an Environmental Impact Statement is only necessary where the effects of an incidental take regulation are *highly* uncertain.   *Id.*

The Plaintiffs maintain that it was arbitrary for the Fish and Wildlife Service to approve the Permit without performing an Environmental Impact Statement because its effects are highly uncertain.   They argue that the Permit itself is "grounded in uncertainty[,]" because the take calculations are uncertain, the minimization and mitigation measures may not work, and the Permit's funding mechanism is speculative.   ECF No. 112 at 41.

The Plaintiffs base their argument that the effects of the Permit are highly uncertain on their separate arguments concerning the alleged shortcomings of Maine's take calculation, minimization and mitigation measures, and Permit funding.   *See* ECF No. 112 at 42 (citing Parts IA and IB of the Plaintiffs' brief).   For the reasons explained in section III.B. of this decision, I have found those arguments to be unpersuasive.   The Plaintiffs have not demonstrated that the Service failed to evaluate the uncertain effects question.

### (f)  Highly Controversial Effects of the Permit

The Council on Environmental Quality regulations require an agency to consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).  The Plaintiffs claim that the Fish and Wildlife Service arbitrarily failed to prepare an Environmental Impact Statement despite the fact that: (i) it admitted in the Environmental Assessment that the effects of the Permit were highly controversial; (ii) its own experts disputed the size, nature, and effect of the Permit; and (iii) the public

overwhelmingly disagreed with the Finding of No Significant Impact during the public review process.  ECF No. 112 at 44 (citing AR-0026368).  The Plaintiffs cite numerous pages from the administrative record, yet as explained more fully below, these citations provide no more than modest support for their contentions.

> ### (i)   Alleged Admission That the Permit's Effects Were "Highly Controversial"

The single document cited by the Plaintiffs to support their claim that the Fish and Wildlife Service admitted that the Permit's effects were "highly controversial" is a one-page excerpt of an August 2011 draft outreach plan apparently written by the Service in connection with a public notice announcing the publication of Maine's draft Incidental Take Plan.  AR-0026368.  The document is not part of the Environmental Assessment.  *See id.*  More importantly, the "admission" the Plaintiffs refer to consists of the observation that "[t]rapping is controversial, period."  *Id.*  This statement is about trapping in general, rather than the effects of the Permit itself.  Furthermore, because the draft document was written several years before the take calculation and the minimization and mitigation measures were finalized, the quoted statement does not amount to an admission by the Service regarding the final Permit.  *See Nat'l Ass'n of Home Builders,* 551 U.S. at 658-59 (the federal courts are empowered to review only the agency's final action).

> ### (ii)   Dispute Among the Fish and Wildlife Service's Own Experts

With regard to the Plaintiffs' assertion that there existed a dispute between the Fish and Wildlife Service's own experts during the planning process, ECF No. 112 at 45 (citing *Nat'l Wildlife Fed'n,* 128 F. Supp. 2d at 1278, 1301), the record does not

reflect a "substantial controversy" that would trigger the need for an Environmental Impact Statement.

The first of two documents cited by the Plaintiffs is a 2014 email that reflects two Service biologists' disagreement with the Regional Office over "some of the positions the agency is taking." AR-0067763. The second document is a one-page excerpt from the Service's draft 2011 response to public comments received in response to the 2008 draft Incidental Take Plan and contains comments from an unidentified author on the subject of adaptive management commitments. AR-0053484. The document reflects that there "continue[d] to be a debate" regarding the issue between the Service's Field Office and another unidentified entity. *See id.* Assuming that the document refers to a debate between the Service's Field Office and Regional Office, these comments represent the views of individual staff members and does not constitute evidence of a substantial controversy requiring an Environmental Impact Statement. "[T]he mere existence of internal disagreements does not make the agency's decision arbitrary or capricious." *Nat'l Wildlife Fed'n,* 306 F. Supp. 2d at 928 n.15. Additionally, the existence of a debate does not, without more, demonstrate the existence of a "substantial dispute as to the size, nature, or effect" of the Permit. *See Found. for N. Am. Wild Sheep v. U.S. Dept. of Agr.,* 681 F.2d 1172, 1182 (9th Cir. 1982); *see also Nat'l Wildlife Fed'n,* 306 F. Supp. 2d at 928 n.15.

In *Sierra Club v. U.S. Forest Service,* the U.S. Court of Appeals for the Ninth Circuit concluded that the plaintiff established the existence of a controversy under § 1508.27(b)(4) based on "affidavits and testimony of conservationists, biologists, and other experts who were highly critical of the [Environmental Assessment] and

disputed the [agency's] conclusion that there would be no significant effects" from a proposed logging project. *Sierra Club,* 843 F.2d 1190, 1193 (9th Cir. 1988). In contrast with the affidavits and testimony considered in *Sierra Club*, the two documents cited by the Plaintiffs—each a single page from the administrative record presented in isolation—do not establish that the Permit's effects were highly controversial.

The Plaintiffs also cite four documents as proof that biologists in the Service's Field Office identified deficiencies in the Permit and the Environmental Assessment. The first document is a July 2007 memorandum noting deficiencies in Maine's proposed minimization and mitigation plans, which was written seven years before the Permit was issued and cannot be said to demonstrate a serious controversy regarding the effect of the Permit as finally adopted seven years later. AR-0008224-25. The second and third documents are two one-page excerpts of draft Environmental Assessments containing critical comments and notations by an unidentified author. AR-0053982; AR-0066833. Of these two documents, only one— AR-0053982—indicates that the criticisms were forwarded to the Service's Regional Office for consideration. *See* AR-0053982. The fourth document is an anonymous September 2014 comment expressing reservations about the public comment period. AR-0045898.

The various documents cited by the Plaintiffs reflect that there was a debate and even disagreement within the Service regarding the effects of the Permit. Considered together, and in relation to the voluminous record as a whole, these

documents do not show that the effects of the Permit were "highly controversial" for purposes of 40 C.F.R. § 1508.27(b)(4).  *See Sierra Club,* 843 F.2d at 1193.

### (iii)   Public Controversy

The Plaintiffs also claim that the effects of the Permit were highly controversial because the Fish and Wildlife Service received over 11,000 comments during the public comment period and that many of these comments disputed the agency's draft and final Environmental Assessments, although the Plainitffs offer no evidence explaining how many of the 11,000 comments contained criticisms of or opposition to the Service's conclusions.  The Plaintiffs, citing *Wild Sheep,* 681 F.2d at 1182, argue that numerous comments disputing an agency's conclusions may establish an action as controversial.  ECF No. 112 at 46.

In *Wild Sheep*, the court concluded that the regulation at issue was "highly controversial" because the agency had received "numerous responses from conservationists, biologists, and other knowledgeable individuals, all highly critical of the [Environmental Assessment] and all disputing the [Environmental Assessment's] conclusion[.]"  *Wild Sheep,* 681 F.2d at 1182.  Rather than the raw number of comments received by the agency, the court based its conclusion on the consensus of identified experts, including "biologists, zoologists, the California Department of Natural Resources, and the California Department of Fish and Game" who submitted comments that were critical of the agency's regulation.  *Id.* at 1178 n.31, 1182.

Here, in contrast, the Plaintiffs have not identified a single public comment contained in the administrative record.  Instead, the Plaintiffs rely upon the Service's

draft Finding of No Significant Impact, which includes a comment by an agency staffer stating that "11,000 public comments may seem controversial to some[,]" AR-0057017, and another anonymous comment appended to a draft 2014 response to the public comments stating that "several of the [Council on Environmental Quality] criteria [including public controversy] . . . could be considered by some to be triggered." AR-0067419. These record citations suggest that the Permit may be controversial to some but they do not demonstrate that the effects of the Permit are "highly controversial" for purposes of § 1508.27(b)(4). *See Wild Sheep,* 681 F.2d at 1182; *Sierra Club,* 843 F.2d at 1193.

### (g)    Conclusion Regarding Intensity Factors

Whether the Incidental Take Permit would significantly affect the quality of the human environment for purposes of 42 U.S.C.A. § 4332(c) required the Service to weigh each intensity factor individually and in relation to all ten factors. It is apparent from the record that the Service undertook that analysis. Because there is a rational connection between what the Service found and the conclusions it reached as to each factor and the factors as a whole, the Service's Finding of No Significant Impact is deserving of deference. *See Sierra Club v. Marsh,* 976 F.2d 763, 769 (1st Cir. 1992).

### D.    Proposed 2015 Plan Amendments

During the 2014-2015 trapping season—the first trapping season after the Incidental Take Permit took effect—two Canada lynx died in legally set traps. AR-0074135. In response, Maine implemented an emergency regulation pursuant to the "changed circumstances" provisions of the Incidental Take Plan. AR-0070222

("Changed Circumstance #3").  The emergency regulation restricted the use of certain trap types and sizes in certain wildlife management districts for the remainder of the 2014-2015 trapping season.  AR-0073462-63.  Maine also amended existing state trapping regulations to eliminate other types of traps entirely, AR-0074316-24, and requested that the Fish and Wildlife Service allow it to amend the Incidental Take Plan to incorporate these changes.  AR-0074135-43.  In its letter approving the amendments, the Service stated that the Plan amendments were "minor in nature and scope" and could therefore "be processed according to the 'Minor Amendment' provision in the Plan[.]"  *See* AR-0074518.

The Plaintiffs challenge the amendments as arbitrary and capricious, contending that the Service should have revoked its previous Finding of No Significant Impact and prepared an Environmental Impact Statement.  Minor amendments, the Plaintiffs maintain, should be limited to amendments that are commonly needed over the life of a permit and may be expedited without resort to the same process as the original permit application, citing the Service's Habit Conservation Planning and Incidental Take Permit Processing Handbook in support. ECF No. 112 at 48 (citing AR-0000597).  The Plaintiffs contend that the amendments that were necessitated by the deaths of two lynx so soon after the Permit took effect were not minor because the amendments resulted from an emergency response to unforeseen and unanalyzed high levels of take within the first month of the Permit's issuance.  The Plaintiffs argue that the Service should have required Maine to revisit its lethal take calculations and reconsider the minimization and mitigation measures. The  Service  responds  that  the  amendments  were  properly  treated  as  minor

amendments and, as such, the Service was justified in employing the expedited procedure established in the Incidental Take Plan.[19]

Two factors lead me to conclude that the Service did not act arbitrarily and capriciously when it treated the 2015 amendments as minor.  First, Maine's August 24, 2015, letter to the Service requested "proposed amendments that [Maine] would like to make to the Incidental Take Permit . . . that was issued . . . last November." AR-0074135.  This supports the Plaintiffs' position that Maine sought an amendment of the Incidental Take Permit.  The Service contends, however, that what was sought and granted was an amendment to the Incidental Take Plan, and not the Permit. This view also finds support in the August 24, 2015, letter which refers to "an updated version of our *Plan*[,]" AR-0074135 (emphasis added), and seeks to implement a Changed Circumstance that was contemplated by the Incidental Take Plan.  AR-0074136 (describing eliminating the use of leaning pole sets); AR-0070222.

The distinction between the Permit and the Plan is the key to resolving this issue.  Although the August 24, 2015, letter was ambiguous, it is clear that what Maine ultimately sought, and what the Service granted, was an amendment to the Incidental Take Plan.  The Handbook recognizes that the Plan "can also be amended

---

[19] The Plan provides:

> Minor amendments are changes to the [Plan], the effects of which on [Plan] species, the conservation strategy, and [Maine's] ability to achieve the biological goals and objectives of the [Plan], are either beneficial or not significantly different than those described in [the Plan].  Such amendments also will not increase impacts so species, their habitats, and the environment beyond those analyzed in the [Plan, Environmental Assessment, and Biological Opinion] or increase the levels of take beyond that authorized by the [Permit].

AR-0070239-40.

administratively without formal amendment of the permit itself." AR-0000597. Thus, the Service was not required to revisit the Permit, revoke the Finding of No Significant Impact, and prepare an Environmental Impact Statement. The Handbook is the only authority cited by the Plaintiffs to advance their argument concerning the 2015 amendment.

The second factor that leads me to conclude that it was not arbitrary and capricious for the Service to label the 2015 amendment as minor is the fact that the Incidental Take Plan defines "minor amendments" as amendments that "will not increase impacts to species," and that "are either beneficial or not significantly different" from those already in the Plan. AR-0070239. The 2015 amendments added restrictions to trapping by (1) eliminating certain types of traps such as leaning pole sets and drags for foothold traps, and (2) imposing additional requirements for setting foothold traps in order to reduce the risk of injury to lynx. AR-0074135-39. Because the 2015 amendments required greater restrictions on trapping in Maine, it was reasonable for the Service to conclude that the amendments would benefit Canada lynx and would not increase impacts on the species.[20] Thus, the requirements for minor amendments to the Incidental Take Plan were satisfied.

## IV. CONCLUSION

In a case such as this, judicial review of the Fish and Wildlife's Service's actions must be both "searching and careful," *Marsh v. Or. Nat. Res. Def. Council,* 490 U.S. 360, 378 (1989), but also deferential so that the court does not "substitute its

---

[20] The Plaintiffs do not argue that these new restrictions will present greater risks to the lynx, nor have they cited record evidence that supports that position.

judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971).  For the reasons I have explained, Plaintiff Friends of Animals has standing to sue.  I further conclude that the Fish and Wildlife Service did not act arbitrarily and capriciously by approving Maine's application for an Incidental Take Permit, deciding not to prepare an Environmental Impact Statement, or treating Maine's 2015 amendment to the Incidental Take Plan as minor.  Accordingly, because the Service's actions were in keeping with the requirements of the Endangered Species Act, 16 U.S.C.A. §§ 1531-1544; the National Environmental Policy Act, 42 U.S.C.A. § 4321, *et seq*.; and the Administrative Procedure Act, 5 U.S.C.A. § 706, the Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 112) is **DENIED** and the Service's Cross-Motion for Summary Judgment (ECF No. 113) is **GRANTED.**

**SO ORDERED.**

**Dated this 15th day of February 2017**

**/s/ JON D. LEVY**
**U.S. DISTRICT JUDGE**